NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

----------------------------------------------------------X
In re:                                                     Bankruptcy Case No. 20-20092

Michael Konecny                                            Chapter 7

       Debtor
----------------------------------------------------------X
Timothy Pascucci

       Plaintiff

vs.                                                        Adversary No. 21-1244

Michael Konecny
                                                 MEMORANDUM OPINION
       Defendant

----------------------------------------------------------X

APPEARANCES

Counsel for Plaintiff
William E Denver, Esquire
The Denver Law Firm, LLC
331 Newman Springs Road
Bld 1
Ste 4th Floor, Suite 143
Red Bank, NJ 07701

Counsel for Defendant
Peter Broege, Esquire
Broege, Neumann, Fischer & Shaver
25 Abe Voorhees Drive
Manasquan, NJ 08736

I. Introduction

The debtor, Michael Konecny, is a building contractor. This dispute arises out of a home construction project. Timothy Pascucci has filed a four-count complaint. The first three counts seek to have debt declared non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). Alternatively, the complaint seeks to deny the debtor a discharge pursuant § 727(a)(3).

II. Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey. This matter is a core proceeding pursuant 28 U.S.C. § 157(b)(2)(I) and (J). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

III. Facts and Procedural History

Timothy Pascucci owns a home at 19 Maple Ave., Keansburg, NJ that was damaged during Superstorm Sandy. On July 6, 2016, Mr. Pascucci entered into a contract with Consumer Builders, Inc. to repair and raise his home ("Contract").[1] Consumer Builders, Inc. is wholly owned by the debtor. The Contract contained the job description: "House Lift with Foundation work, Partial renovation, and new stairs to grade." This job description was followed by two and a half pages of specific job details. The contract price was stated as $150,100 and the Contract specified that it was "to be paid by Jersey Stronger Grant and as checks are released they are

---

[1] Ex. D-1

2

to be immediately released to Consumer Builders."[2] In the section titled "Payments & Disbursements" the Contract provided: "Owner is responsible to pay all payments." In that section, the word "Owner" was crossed out and "Jersey Strong" was hand-written in, a change initialed by both parties. An undated document titled "Cost Breakdown" increased the total for the project to $163,000 by adding a $12,000 line item for "Design est allowences [sic] for blueprints, soil, elevastion [sic] certs etc."[3] The parties' agreement also included a change order dated June 16, 2017. The amount listed in the change order was $33,600. The change order contained the same "Payments & Disbursements" section as the Contract but left in the provision that the "Owner is responsible to pay all payments."

Consumer Builders stopped working on the project sometime in 2017.[4] At that time, the project was not complete. In a letter dated February 2, 2018, Mr. Pascucci asked Michael Konecny to continue work and complete construction on his home.[5] Mr. Konecny did not return to work. In May 2019, Mr. Pascucci filed a complaint against Mr. Konecny and other parties in New Jersey Superior Court based on the NJ Consumer Fraud Act, unjust enrichment, violation of the duty of good faith and fair dealing, and fraud. As a result of this bankruptcy filing, that action was stayed as to Mr. Konecny.

---

[2] The official name of the grant program is the Homeowner Reconstruction, Rehabilitation, Elevation and Mitigation (RREM) Program.
[3] Ex. D-1
[4] There was conflicting testimony about whether the work stopped in the summer of 2017 or later in the year, but a precise date is not essential for the purposes of this analysis.
[5] Ex. P-2

3

The Plaintiff submitted an expert report prepared by Peter G. Engle of Almost Home, Inc.[6] The Defendant submitted an expert report prepared by John N. Clemente of Certified Contracting, Inc.[7] Both experts testified at trial. After a two-day trial, the court reserved decision. The parties submitted post-trial briefs.[8]

IV. Analysis

One of the core policies underlying the Bankruptcy Code is to provide a debtor with a fresh start.[9] For that reason, the exceptions to discharge outlined in § 523(a) are construed strictly against creditors and liberally in favor of debtors.[10] A creditor objecting to the dischargeability of an indebtedness bears the burden of proof.[11] The creditor must establish the nondischargeability of a debt by a preponderance of the evidence.[12]

## A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) (a) provides that a discharge under section 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud …." Courts vary in the number of elements that must be proven, but those variations are more stylistic than

---

[6] Ex P-?
[7] Ex. D-3
[8] Doc. 13, 14
[9] *In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013)
[10] *In re Cohn*, 54 F.3d 1108 (3d Cir.1995)
[11] *In re Bayer*, 521 B.R. 491, 499 (Bankr. E.D. Pa. 2014)
[12] *Grogan v. Garner*, 498 U.S. 279, 291 (1991)

substantive.[13] Courts typically require proof that the debtor: (1) obtained money, property or services by falsely representing or omitting a material present or past fact; (2) that the debtor knew at the time was false (or presented it with disregard for its truth); (3) the debtor intended that the plaintiff rely on that statement; (4) the plaintiff actually relied on that statement and the reliance was justified; and (5) the plaintiff sustained damages as the proximate result of the false representation.[14]

1. Material misrepresentation

The alleged misrepresentations in this case fall into two general categories: 1) that Mr. Konecny promised that he would make the house "beautiful" and 2) that he promised he could complete the project for the amount of the RREM grant money.

At trial, both Mr. Pascucci and his neighbor Angelo Estela testified that Mr. Konecny promised on more than one occasion that there was nothing to worry about because he would make the house beautiful.[15] A non-specific representation such as that will rarely suffice for purposes of § 523(a)(2)(A). Such statements are commonplace in construction adversary proceedings and courts consistently hold that a "contractor's general representations regarding his expected work performance and the actual quality of that workmanship do not qualify as

---

[13] *Molz v. Price*, 613 B.R. 599, 603 n. 1 (Bankr. D.N.J. 2020) ("the number of elements appears to be merely organizational")
[14] *See e.g.*, *In re Schneider*, 2021 WL 6013539, at *11 (Bankr. D.N.J. Dec. 15, 2021); *In re Sevastakis*, 591 B.R. 197, 202 (Bankr. D.N.J. 2018)
[15] Trial transcript at 23, 31, 96 [Doc. 15]

5

misrepresentations for purposes of section § 523(a)(2)(A)."[16] That sort of puffing, even if incorporated into a written contract, has been held to be insufficient.

For example, in *Wiszniewski* the bankruptcy court determined that contractual language stating that the work would be performed "in a professional manner according to standard practices," and an oral representation that a higher quality floor would be installed, qualified as "broken promises," but not misrepresentations.[17] By contrast, the bankruptcy court in *Purington* found there was a misrepresentation when the contractor, contrary to her advertisement and initial presentation to the plaintiffs, had no workforce in place and had not registered her company as a construction contractor in New Jersey. No comparable quantifiable misrepresentations were present here. From the evidence submitted at trial, it is irrefutable that at the time Mr. Konecny ceased work on the project he had not made the house "beautiful," but poor-quality workmanship, without more, does not equate to an actionable misrepresentation.[18]

Next, the court turns to whether Mr. Konecny made a material misrepresentation that the project would be completed for the amount of the RREM grant money. The evidence on this point was equivocal. The testimony of all the Plaintiff's witnesses was that Mr. Konecny stated that the project could be completed for the original contract price plus the $12,000 design fee. That testimony

---

[16] *In re Purington*, 2012 WL 1945510 *10 (Bankr. D.N.J. May 30, 2012)
[17] *In re Wiszniewski*, No. 09–11102, 2010 WL 3488960, *6 (Bankr.N.D.Ill. Aug. 31, 2010)
[18] *See, e.g., In re Henderson*, 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010) ("Substandard performance or a mere breach of the construction contract do not rise to the level of fraud necessary to except the debt from discharge."); *In re Barr*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996) (a "botched job", without more, is not the same as a misrepresentation).

6

is supported by some of the documentary evidence. The contract price was stated as $150,100 and the Contract specified that it was "to be paid by Jersey Stronger Grant and as checks are released they are to be immediately released to Consumer Builders." Another provision of the Contract was altered to provide that Jersey Strong rather than the owner was responsible for all payments. What was not established at trial was whether Mr. Konecny ever promised that the initial contract price was a ceiling that could not be exceeded no matter what possible defects were uncovered in demolition. In other words, the Plaintiff failed to establish that Mr. Konecny told him that he would complete the project for whatever Jersey Strong was willing to pay and under no circumstances would he ever seek any contribution from Mr. Pascucci. That subtle distinction is what would transform this from a breach of contract case to a nondischargeable fraud.

      The testimony also established that Mr. Pascucci never informed Mr. Konecny that the amount of the RREM grant he received from the state had been reduced by the amount of insurance money Mr. Pascucci had received. Had Mr. Pascucci truly believed that he was not obligated to pay Mr. Konecny a dime that did not come from the state, then that is information one would expect to have been disclosed to the Debtor. Further muddying the waters is the change order dated June 16, 2017, which listed a price of $33,600. The change order contained the same "Payments & Disbursements" section as the Contract but left in the provision that the "Owner is responsible to pay all payments." The experts presented conflicting testimony on the issue of whether some of the items listed in the change order were

already included in the original contract, but more telling is that Mr. Pascucci did not alter the change order to indicate that he would not be responsible for any payments.

Overall, neither side established the existence or absence of a material misrepresentation on the issue of whether Mr. Konecny promised not to seek payment beyond what the state provided. When evidence is in equipoise, the plaintiff (as the party with the burden of proof) loses. The court could stop its analysis here because a plaintiff must establish all five elements by a preponderance of the evidence to prevail on its cause of action, but the court finds that the Plaintiff also failed to prove other elements of 523(a)(2)(A) as discussed below.

2. Debtor's knowledge

The next element a plaintiff must establish is that if there was a material misrepresentation that the debtor knew at the time that it was false or made the representation with reckless disregard for its truth. Mr. Pascucci's expert testified that he thought the contract had been underbid by at least $100,000.[19] Assuming that the contract price was a material misrepresentation, the court still cannot find that the Plaintiff established that Mr. Konecny consciously underbid the contract. When Mr. Konecny was asked if he thought he could complete the job for the contract price he responded: "a hundred percent. Like, I -- I've done many of the houses. I built a new house for $150,000. I'm a hands-on engineer. I have a lot of

---

[19] Trial transcript at 112-13 [Doc. 15]

8

contacts, and I've done it multiple times. I've lifted multiple house on North Shore Drive, Seaview, Bayview, Campview. I -- I've -- have -- I basically have no problems."[20] Mr. Konecny may have been far off the mark with his costs estimates, but he convincingly testified that he personally believed that he could complete the project for the contract price. Plaintiff's evidence - such as an online review of Consumer Building[21] that stated that the company low-bids and then uses change orders to raise the price - did not discredit that testimony. The idea that Mr. Konecny knew that his contract price was way too low is also inconsistent with other facts developed at trial. For example, Mr. Pascucci testified that on numerous occasions he told Mr. Konecny that he did not have any money beyond the grant money to use for the renovation of his home. Accepting that as true, there would be zero incentive for Mr. Konecny to knowingly low-bid the contract in the hopes of increasing his profit margin later through change orders.

    3. <u>Debtor's intent</u>

When examining this factor, the focus must be on a debtor's mindset when he made any alleged representation. If there was fraudulent intent at that point then the debt is nondischargeable, but if services were not rendered or were not satisfactorily rendered then it is breach of contract. As stated by one court, "[T]he

---

[20] Trial transcript at 192 [Doc. 15]
[21] Trial transcript at 7 [Doc. 16] ("he always low bids and brings hundreds of rework orders, stops working, lies.")

failure to honor one's promise is a breach of contract, but making a promise that one intends not to keep is fraud."[22]

Fraudulent intent is rarely, if ever, admitted so courts look at the totality of the circumstances to divine intent.[23] Here, the totality of the circumstances fail to establish that Mr. Konecny entered into the contract with fraudulent intent. The evidence shows that Mr. Konecny not only began work on the project, but also completed work roughly equivalent to the amount he was paid under the contract. The total contract price was $163,000 and Mr. Pascucci made payments of only $123,000. Debtor's expert concluded that "the value of the work performed by Consumer was at least equal to the $123,000.00 that had been paid."[24]

Plaintiff's evidence that the foundation was inadequate causing further damage to the home or that the worksite was hazardous due to improperly handled asbestos is not tantamount to evidence that Mr. Konecny entered into the contract with the intent of damaging the property and leaving Mr. Pascucci in the lurch. It is illogical to conclude from the evidence presented that a contractor such as Mr. Konecny, who derives much of his business from referrals, would enter into the contract with Mr. Pascucci with the express intent of taking the grant money and then leaving the project unfinished. Rather, the evidence shows a botched construction job and some broken promises. As noted by the bankruptcy court in

---

[22] *Murphy v. Snyder (In re Snyder),* 2017 WL 1839122, at *12 (Bankr. D. Conn. May 5, 2017)
[23] *In re Schneider*, 2021 WL 6013539 (quoting In re Reynolds, 193 B.R. 195, 200 (Bankr. D.N.J. 1996)
[24] Ex. D-1

10

*Horton*, "proof of the performance of substandard work [cannot be equated] with proof of fraudulent intent. Moreover, such a precedent could not feasibly exist without elevating nearly every breach of contract action to a level of actionable fraud."[25]

    4. <u>Justifiable reliance</u>

The Supreme Court has held that § 523(a)(2)(A) requires a showing of "justifiable" rather than reasonable reliance.[26] Justifiable reliance is a lower threshold than reasonable reliance and does not require a creditor to make an independent investigation of every representation.[27] But this concept is not without limits and requires a creditor to use his or her senses and to determine facts based on the creditor's knowledge and capacity.[28]

Mr. Pascucci testified that he did not go with the first two estimates he obtained because the cost was significantly over the $150,000 grant money. A representative from the Jersey Strong program told Mr. Konecny that he should tear down the house because rehabbing it would cost $400,000.[29] Yet, despite that, Mr. Pascucci chose to rely on the contract price presented by the Debtor without getting further written assurances that Mr. Konecny and his company would accept

---

[25] 372 B.R. 349, 358 (Bankr. W.D. Ky. 2007)
[26] *Field v. Mans*, 516 U.S. 59, 74-75 (1995); *In re August*, 448 B.R. 331, 350 (Bankr. E.D. Pa. 2011) (same, but also noting that creditor must prove that it actually relied on alleged misrepresentation)
[27] *Id.* at 350-51 (collecting cases)
[28] *Field v. Mans*, 516 U.S. at 71, citing Restatement (Second) of Torts § 540 (1976); W. Prosser, Law of Torts § 108, p.718 (4th ed. 1971); and W. Prosser, et al., Prosser and Keeton on Law of Torts § 108, p.752 (5th ed. 1984).
[29] Trial transcript at 22-23 [Doc. 15]

the grant money as the upward cap of what would be paid for completion of the entire project. Under the circumstances that is simply not justifiable.

    5. Damages

The court did not entertain evidence on the quantum of damages because it would have been pointless unless the Plaintiff prevailed on the 523 counts.

Overall, the court finds that the Plaintiff failed to establish four of the five elements of a 523(a)(2)(A) cause of action. As the court noted in *Molz v. Price*[30]

> In cases involving a debtor-contractor … courts in this Circuit have generally recognized two ways to establish misrepresentation or fraud under section 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms, or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work.

Neither of those has been established. Given the amount of work (albeit perhaps not of good quality) that even the Plaintiff's own expert concedes was done on the job it has not been shown that Mr. Konecny never intended to comply with the terms of the contract. There are numerous cases in which a contractor accepts significant deposit money and then disappears, but this is not one of those cases. Nor has it been demonstrated that Mr. Konecny intentionally misrepresented a material fact or qualification when soliciting the work. In fact, Mr. Konecny never even solicited this work. Rather, Mr. Pascucci sought him out after seeing his's company's sign at other home-lifting projects in the neighborhood.

Based on the foregoing, the court finds that the plaintiff has not sustained his burden of proof and rules in the Debtor's favor on Count I.

---

[30] 613 B.R. at 604 (internal citations omitted)

## B. 11 U.S.C. § 523(a)(4)

Section 523(a)(4) excepts from discharge debts traceable to "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." Plaintiff asserts that Mr. Konecny's behavior constitutes both larceny (theft by deception) and fraud while acting in a fiduciary capacity.

Plaintiff's post-trial brief cites to New Jersey law for the definition of a fiduciary relationship. The interpretive case law is quite consistent in noting that the term "fiduciary under § 523(a)(4) is distinct from the concept of a 'fiduciary' under the common law; it is limited to instances involving express or technical trusts. The purported trustee's duties must ... arise independent of any contractual obligation."[31] Plaintiff asserts that Michael Konecny was "in a dominant and superior position" to Timothy Pascucci because he had many years of building experience and, more specifically, experience working with the NJ Stronger program. Those facts were not refuted at trial. Notwithstanding that, Mr. Konecny's superior knowledge of the construction industry or even the loan program at issue does not elevate the parties' contractual relationship to a fiduciary relationship. As frequently noted: "the § 523(a)(4) discharge exception is not designed to apply to debts arising from ordinary commercial or contractual relationships."[32] The Plaintiff offered no evidence that an express or technical trust existed here. Absent that, the claim that there is a nondischargeable debt for fraud while acting in a fiduciary capacity must fail.

---

[31] In re Shcolnik, 670 F.3d 624 (5th Cir. 2012) (internal citations omitted)
[32] See, e.g., In re Coley, 433 B.R. 476 (Bankr. E.D. Pa. 2010) ("a trust relationship must instead be express or technical or originate from state law to create the necessary fiduciary relationship for § 523(a)(4) purposes.")

13

That still leaves the claim that Mr. Konecny committed larceny because that portion of § 523(a)(4) does not require that the debtor be acting in a fiduciary capacity.[33] Here again, the Plaintiff cited to New Jersey case law regarding theft by deception (aka larceny).[34] That is not the correct standard because, similar to the term "fiduciary," the term "larceny" is defined by federal common law. Under federal common law, larceny is the "felonious taking of another's personal property with intent to convert it or deprive the owner of same."[95] The elements of larceny are: (1) the fraudulent and wrongful taking away of the property of another with (2) the intent to convert it to the taker's use and with intent to permanently deprive that owner of such property.[35] Larceny necessarily requires an unlawful taking. The Plaintiff asserts that Mr. Konecny "leveraged his position to trick and deceive Pascucci into paying an additional $10,100 payment in November 2017 by promising that the plumbing would be promptly installed within the next two weeks in order to prepare the home for the winter."[36] The evidence does not support the assertion that a fraudulent promise by Mr. Konecny was what induced Mr. Pascucci to make the November 2017 payment. Mr. Pascucci's letter to Mr. Konecny in February 2018 states: "In November I gave you another check for $10,100, that was on the sixth, and asked you when you were going to complete my steps and put in my plumbing. You

---

[33] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275 (2013) ("Nor are embezzlement, larceny, and fiduciary fraud simply special cases of defalcation as so defined. The statutory provision makes clear that the first two terms apply outside of the fiduciary context.")
[34] Plaintiff's brief also cited to *In re Bocchino*, 794 F.3d 376 (3d Cir. 2015) but because that case involved § 523(a)(2)(A) not § 523(a)(4) it is of limited applicability to this analysis.
[35] *In re Michelena*, 641 B.R. 325, 340 (Bankr. S.D. Tex. 2022)
[36] Plaintiff Post-Trial Brief at 16

14

stated, then, that you would start within two weeks …." Mr. Pascucci's own words indicate that he asked about the plumbing *after* making the payment rather than the promise being what induced him to make the payment. Plaintiff has also failed to sustain his burden of showing that the $10,100 was something separate from the initial contract price that was agreed to. The total contract price was $163,000 and Mr. Pascucci made payments of only $123,000.

For the foregoing reasons, the court rules in the Debtor's favor on Count II.

## C. 11 U.S.C. § 523(a)(6)

Section 523(a)(6) prevents discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." Authorities have interpreted the operative language in § 523(a)(6) as embodying two distinct requirements: willfulness and malice.[37] Accordingly, a creditor had the burden to establish that a debtor's actions were both willful and malicious.[38]

To be "willful" the debtor's actions "must have been voluntary and deliberate."[39] Actions that are merely negligent or reckless will not suffice.[40] As noted by the Third Circuit in *In re Conte*, "for the injury to have been "willed" by the debtor, it must at least have been substantially certain to result from the debtor's act."[41] The Supreme Court has further clarified that the word "willful"

---

[37] Alan N. Resnick & Henry J. Sommer, 4 Collier on Bankruptcy ¶ 523.12[2] (16th ed. 2009); *In re Fechnay*, 425 B.R. 212 (Bankr. E.D. Pa. 2010)
[38] *In re Ormsby*, 591 F.3d 1199 (9th Cir. 2010)
[39] *Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128 (Bankr. E.D. Pa. 2008)
[40] *See, In re Ingui*, 2006 WL 637139 *2, n. 2 (Bankr. E.D. Pa. 2006) (citing Kawaauhau, 523 U.S. at 64)
[41] 33 F.3d 303, 307 (3d Cir. 1994)

15

modifies the word "injury," therefore, nondischargeability under § 523(a)(6) "requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[42]

Applying this standard, Mr. Konecny would have had to intend to damage Mr. Pascucci's house at the time he entered into the contract with him; however, nothing in the complaint or the evidence at trial supports that conclusion Rather, the allegations are that the work performed at the property was unacceptable and that the job was not completed. Such proof falls short of what is needed to sustain a claim under section 523(a)(6).

The court finds in the Debtor's favor on Count III.

## D. 11 U.S.C. § 727(a)(3)

Count IV of the Complaint is predicated on section 727(a)(3) of the Bankruptcy Code which denies a debtor a discharge if the debtor has failed to maintain proper financial or business records unless the failure "was justified under all of the circumstances of the case."[43] It is well-settled law that a denial of a debtor's discharge is a drastic remedy, therefore, § 727 must be construed strictly in favor of the debtor.[44] A discharge in bankruptcy, however, is "a privilege, not a right, and may only be granted to the honest debtor ."[45] Accordingly, "where a debtor has been dishonest in his dealings with the court or his creditors, it may be

---

[42] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)
[43] 11 U.S.C. § 727(a)(3)
[44] *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge ... is an extreme step and should not be taken lightly")
[45] *In re Virovlyanskiy*, 485 B.R. 268, 271 (Bankr. E.D.N.Y. 2013), *aff'd*, 2014 WL 1800411 (E.D.N.Y. May 6, 2014)

16

appropriate to deny his discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor with a fresh start."[46] The creditor opposing discharge has the burden of establishing the requisite elements by a preponderance of the evidence.[47]

The entirety of the allegations against the Debtor on this Count are contained in paragraph 60 of the Complaint, which provides:

> Defendant-Debtor has acknowledged that he kept extremely poor records, did not file 1099 tax forms for payments to workers, contractors or subcontractors, did not file payroll tax reports for payments made to contractors, subcontractors and workers, admitted that he did not keep invoices generated by his business or by various subcontractors, claimed he did not have access to checking account records, admitted he did not keep copies of checks written to and from his business, or to or from himself personally, and acknowledged that he created documents in order to support his bankruptcy Petition while simultaneously destroying the original source documents because Debtor-Defendant claimed they were not legible.

At trial, Mr. Konecny testified that he is an old-school contractor and that he kept most of his records in his head. The Third Circuit has held that the Bankruptcy Code does not require that a debtor have "an impeccable system of bookkeeping" or even that a debtor have maintained a bank account.[48] This Code section is designed to alleviate the risk to creditors of "having the debtor withhold or conceal assets under cover of a chaotic or incomplete set of books or records."[49] None of the allegations against Mr. Konecny in the complaint in any way hinge on

---

[46] *Wachovia Bank v. Spitko (In re Spitko)*, 357 B.R. 272, 298 (Bankr. E.D. Pa. 2006)
[47] *Haupt v. Belonzi (In re Belonzi)*, 476 B.R. 899 (Bankr. W.D Pa. 2012); *see also*, Fed. R. Bankr.P. 4005 ("on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection.")
[48] *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1992)
[49] *Id.*

17

the concealment of assets by the Debtor. The Debtor's lackadaisical recordkeeping has no bearing on the underlying dispute here and for that reason the court will rule in the Debtor's favor on Count IV.

## V. Conclusion

The court finds that the Plaintiff has not meet his burden of proof on the 523 or 727 causes of action. Accordingly, the court rules in favor of the Debtor-Defendant on all counts. The court will enter an Order in accordance with this opinion.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
United States Bankruptcy Judge

Dated: March 8, 2023